Cheshire,
No. 4409.

NORMA J. DERBY & a.

*v.*

THE PUBLIC SERVICE COMPANY OF NEW HAMPSHIRE.

SAME *v.* BOWMAN FLYING SERVICE, INC.

SAME *v.* SWANZEY.

Argued November 1, 1955.

Decided December 31, 1955.

*McLane, Carleton, Graf, Greene & Brown* and *Howard B. Lane* (*Mr. Brown* orally), for the plaintiffs.

*Sulloway, Jones, Hollis & Godfrey* and *Joseph S. Ransmeier* and *Irving H. Soden* and *Faulkner, Plaut & Hanna* (*Mr. Ransmeier* and *Mr. Soden* orally), for the defendant Public Service Company of New Hampshire.

*Wyman, Starr, Booth, Wadleigh & Langdell* and *Homer S. Bradley* (*Mr. Booth* orally), for the defendant town of Swanzey.

*Sheehan, Phinney & Bass* and *Harry C. Lichman* (*Mr. Sheehan* orally), for the defendant Bowman Flying Service, Inc.

BLANDIN, J. The main issue is whether the Public Service Company of New Hampshire, a vendor of land, after transfer of title and possession may be liable for injuries sustained by third parties resulting from what could be found to be a dangerous condition

of the land existing at the time of transfer. It is undisputed that a grantor who fails to disclose to a vendee a condition involving unreasonable risk to persons upon the land is liable for harm caused thereby to them after transfer of possession to the grantee, if the latter is unaware of the condition or the risk involved, and the vendor knows of the condition and the risk and has reason to believe that the vendee will not discover them. Restatement, Torts, s. 353; anno. 8 A. L. R. (2d) 218, 227. The test, therefore, to determine whether the issue of the defendant Public Service Company's negligence was properly submitted to the jury is to inquire whether, on the facts here, reasonable men could find that the company knew of the danger and had reason to believe the vendees would not discover it.

Assuming the facts most favorable to the plaintiff (*Naramore* v. *Putnam*, 99 N. H. 175, 176), it appears the jury were warranted in finding the following. The defendant Public Service Company, hereinafter referred to as the company, was a public utility long engaged in the construction, operation and maintenance of dams and power stations. In 1926 it purchased the property in question consisting of a dam, reservoir, gates, and other appurtenances, including a penstock, eight feet in diameter, which connected the reservoir and the power station by passing under a public highway known as the Richmond Road running along the top of the dam. The company knew that the penstock had been installed around 1895 and it was not disputed that before the accident, which happened on June 26, 1952, it was never replaced or repaired and that it had not been used since 1942.

In August, 1929, an examination by Noyes, a company engineer who reported to the defendant employer in the regular course of business, disclosed that the penstock had flattened on top so that instead of being eight feet high, it was only seven and was approximately nine feet wide. It had also "buckled," opening a seam about sixteen inches long; it was then in "poor condition" and "too far gone for patching." Normally repairs would have been made but the record discloses none. In the opinion of this engineer, the buckling caused a washout in the road at this point in the spring of 1929.

About thirteen years later, on June 18, 1942, Williams, the company's chief engineer who had charge of "examining and reporting on conditions of . . . penstocks," made an examination and reported in the regular course of business to the president of

the company in a letter, the material portions of which are as follows: "The penstock under the highway outside the station is also in poor condition and should be renewed. An airport site is being considered near by the structure and if this is built the penstock might be condemned as it is now unsafe for heavy traffic . . . I recommend that the station be abandoned. (Signed) W. H. Williams." Acting on this recommendation, the company ceased to operate and use the generating plant and penstock in the same year.

On December 30, 1944, the utility conveyed the lot upon which the power house stood to the defendant, Bowman Flying Service, Inc., hereinafter referred to as Bowman. Although this deed, taken in connection with a later conveyance to the defendant town of Swanzey of the reservoir and some adjacent lands on March 29, 1948, is not entirely clear, it is findable that the portion of the penstock under the road was not conveyed to Bowman, although he was given the right to fill it in, and he in turn released the defendant company from "all claims or damages . . . resulting from the existence of the said penstock . . . across Richmond Road." The defendant conveyed to the town in 1948 all the original tract except that part previously conveyed to Bowman.

In its deed to Bowman, the company reserved the right to all salvageable machinery and equipment in the power house, and orally undertook as a part of the arrangement to "see to it" that the machinery and equipment was removed. During the years 1945 to 1947, and before the sale to the town, the reserved materials were removed by junk dealers to whom the company sold them. In the course of this removal, there was "an awful lot of ripping and tearing." The waterwheel was cut away from the penstock so that when the former was taken out there was a space of some two or three inches "at the bottom" between the penstock and the masonry wall of the penstock. Before this operation there had been no appreciable seepage of water from the pond into the Bowman basement. However, after the removal the seal which prevented seepage from the pond into the basement was apparently broken, and much water carrying dirt and silt from under the road ran along the outside of the penstock and into the basement where the waterwheel had been. As much of this came from outside the penstock as from inside it. Proper engineering practice required that, after the removal of the wheel and other machinery, the wall be sealed off to prevent water seeping through the dam and washing

away the earth supporting the penstock and the foundations of the road. Seepage is characteristic of all earthen dams and when it occurs, the water tends to follow a smooth surface such as a penstock. When it acquires sufficient velocity to become dangerous the condition is called "piping" and it will wash away the support of the penstock, thereby increasing the likelihood of its collapse. This hazard can be avoided by a masonry wall which prevents the water coming through. Nothing of this sort was ever done nor is there any evidence that the defendant company inspected the work of the dealers to ascertain if any danger of piping existed, although it still had an interest in the penstock.

Although Bowman was aware that dirt and gravel were washing into his basement and the town knew there had been "holes" in the road on occasions before the accident, the testimony on the part of both these defendants was that each thought the other owned the penstock and the land under the highway, and they were never informed by the Public Service Company of any danger of its collapsing, nor is there evidence that they realized any danger existed. As a result, neither took preventive action.

On June 26, 1952, in the early evening, as the plaintiffs were riding in an automobile along the Richmond Road, the highway suddenly gave way over the penstock and the car plunged into a deep hole, causing the injuries complained of. The plaintiffs were admittedly not guilty of contributory negligence. Their expert testified that the "cave in" of the road and the consequent accident was caused by the collapse of the penstock as a result of piping which washed away the lateral support so that the penstock ruptured.

In this situation it clearly appears that reasonable persons could find the defendant company was aware at the time of the conveyances to Bowman in 1944 and the town in 1948 that there was danger of the penstock's collapsing. Not only did it have special knowledge of the perils inherent in an earthen dam with a penstock running through it under a public highway to a waterwheel, but it had been specifically warned of the danger of the collapse of the penstock on two occasions by its own engineers, whose duty it was to inspect and report on just such matters. On the other hand, there is no evidence that either Bowman or the town possessed any special knowledge of the maintenance of dams, penstocks, the dangers of piping or other matters bearing upon the forces which caused this accident. The liability of the company

hinges in large part upon the fact that its knowledge was superior to that of the other defendants. *Derosier* v. *Company*, 81 N. H. 451, 468. In the circumstances we do not believe that all reasonable men must agree that either of the defendants, Bowman or the town, knew or should have known of the danger here, or that the company had any reason to believe that they would discover it.

The defendant's assertion that before liability can be established it must be shown that these plaintiffs came within the orbit of risk of the danger created does not require extended consideration. The persons above all others who might expectably be injured by a cave-in of a public way are travelers lawfully upon it. As such, these plaintiffs who came squarely within the orbit of the risk created by the company's negligence were owed a duty by it. *Palsgraf* v. *Long Island Railroad Co.*, 248 N. Y. 339; *Dillon* v. *Company*, 85 N. H. 449, 453; Restatement, Torts, s. 281, *comment* c; 52 Harv. L. Rev. 372, 382.

Owing this duty to these plaintiffs, it could not escape it by the simple expedient of transferring the property to third parties who were unaware of the danger. The question here is upon whom should the burden fall of seeing to it that the penstock did not collapse and thereby undermine the road. We believe it should be upon the defendant who could be found to have permitted the danger to arise and to be aware of it rather than upon transferees who could be found to be justifiably ignorant both of the condition and the risk. It seems the philosophy of our law and the better authority are in accord with this view. *Pittsfield Cottonwear Mfg. Co.* v. *Shoe Co.*, 71 N. H. 522. *Plumer* v. *Harper*, 3 N. H. 88; *Eastman* v. *Company*, 44 N. H. 143; see also, Restatement, Torts, ss. 353, 413, 416; Prosser, Torts (2d *ed.*) s. 79.

The further claim that in any event the liability of the company should only endure for a sufficient time after the sale to afford the grantees an opportunity to discover the hazard cannot be sustained. It was findable that the grantees, unaware of any peril, had no cause during the time they owned the property to make such an inspection as would have disclosed the danger of collapse of the penstock. The fact that they had time to discover the hazard is not determinative of the company's liability where the exercise of reasonable care by the grantees did not require that they discover it. It is also true that since the risk existed when the transfers were made to Bowman and the town, the fact that no one could tell the moment when, nor the exact manner in which the danger would

cause harm, does not relieve the company. *Nickerson* v. *Association*, 96 N. H. 482, 484, and authorities cited; see also, Restatement, Torts, *s*. 353. In the circumstances of this case reason and authority support the plaintiffs' claim that in the absence of discovery of the danger by the vendees, the company remained liable. Restatement, Torts, *s*. 353, *comment* c. It follows that since the jury could find that the defendant company failed to properly superintend the removal of the equipment from the power house, or to disclose to the vendees a danger of which it was aware and which it had reason to believe they would not discover or appreciate, the motions for a nonsuit and directed verdict were properly denied. Restatement, Torts, *s*. 353; Prosser, Torts (2d *ed.*) *s*. 79.

The situation here is clearly distinguishable from the case of *Cozzi* v. *Hooksett*, 84 N. H. 530, cited by the company. In that case there was no evidence upon which the jury could find that the erection of a standard rail along the highway by the town as required by P. L., *c*. 89, *s*. 2, would have prevented the automobile's plunging off the road with consequent injuries to the passengers. In the case before us, however, the jury could reasonably conclude that proper precautions would have prevented the collapse of the penstock.

The conflict of testimony as to the cause of the accident was for the jury to resolve. There was ample evidence upon which it could be found that the condition of the ruptured penstock, or the unsealing of it, or a combination of the two, permitted the washing away of dirt around the penstock and under the road. The result of this was that lacking support the penstock collapsed, breaking a water main also. Under the weight of the automobile, the highway with its foundation washed away caved in, causing the accident. Had the penstock been in proper repair, it is clearly findable that this would not have happened and the defendant's claim that causation is lacking cannot be sustained.

The company has waived all exceptions to the exclusion and admission of evidence except two. The first which we shall consider relates to a report in the form of a letter dated June 18, 1942, by Williams, the chief engineer of the company to its president, which letter the defendant concedes was "in large part . . . unobjectionable." This report was made on company form stationery by one under a duty to his superior in the regular course of business and was thereafter acted upon and filed. One of the functions of this engineer as previously stated was that of "examining and

reporting on conditions of penstocks." He made such a report to the president and the latter produced it from the company files, identifying the signature and functions of the engineer who was absent at the trial and whose whereabouts was unknown. This document was admissible under RSA 521:2; see also, *Roberts* v. *Company*, 78 N. H. 491; *Williams* v. *Williams*, 87 N. H. 430. While the Court was probably aware of the nature of this letter from counsel's discussion, it would have been better practice for the Presiding Judge to have examined it before its introduction (see *Gagnon* v. *Pronovost*, 97 N. H. 500), yet since it was admissible in any event, the defendant suffered no prejudice because of the failure of the Court to so act. The Williams' report was also competent as evidence of notice of the risk. *American Employers Ins. Co.* v. *Wentworth*, 90 N. H. 112, 116.

The next exception is to a written report of Noyes, also a company engineer, as to the result of his inspection of the penstock in 1929, which report he used to refresh his recollection while testifying. Such a procedure is unobjectionable. *Russell* v. *Croteau*, 98 N. H. 68, 71, and authorities cited. This witness also testified that he learned in the course of making his examination that there had been a washout the previous spring. This information gained in the course of his duties was proper to charge the company with knowledge of the situation. *American Employers Ins. Co.* v. *Wentworth, supra*; see also, *Howe* v. *Jameson*, 91 N. H. 55, 56.

The defendant cannot prevail by its general exception to the charge on the ground that it gave undue emphasis to the case against the company, for while fairness requires a balanced charge (see *Burgess* v. *Railroad*, 98 N. H. 372, 380), an examination of the record discloses no prejudical emphasis of the case against the defendant, nor any likelihood that the jury was misled.

The company also took numerous exceptions to the failure of the Court to grant certain requests. Several of these were given in substance and under our rule this is sufficient as it is not necessary to use the exact wording requested. *Manseau* v. *Railroad*, 96 N. H. 7, 13, and cases cited. Others were inconsistent with the applicable law and were properly refused. *Lynch* v. *Sprague*, 95 N. H. 485. Defendant's request No. 9 was as follows: "Whoever has exclusive control over land and the things done upon it has the responsibility of taking reasonable measures to remedy conditions on the land which may be a source of harm to others." The Court

charged in effect that whether the defendants Bowman or the town controlled the land in question or merely the adjacent property, they had a duty to so care for their property as not to injure the traveling public. We think this instruction was sufficiently favorable to the company and this exception is overruled. Requests Nos. 11 and 12 to the effect that a nuisance cannot be created by nonfeasance as distinguished from malfeasance are not correct statements of the law here and they were properly denied. *Bixby* v. *Thurber*, 80 N. H. 411, 414, 415. The defendant company's request No. 19 to the effect that no evidence introduced in these consolidated trials after the close of its case could be used against it comes to nothing. *Lynch* v. *Bissell*, 99 N. H. 473.

The defendant asserts only one ground existed for liability, namely, whether it could be held for injuries sustained on or near land after transfer of possession and control, and takes issue with the charge submitting to the jury in effect three grounds. The first was that if the company negligently permitted the penstock running under the public highway to become dangerously weakened, thereby imperiling travelers, it created a nuisance. This was findable on the record. *Bixby* v. *Thurber*, 80 N. H. 411, 413. If a nuisance was found to exist, the transfer of property did not relieve the company of its duty to these plaintiffs. *Id.*, 415-416. We find no error in the charge on this score. The second was that the defendant would be liable if it knew a dangerous situation existed which expectably would not become known to the vendees, and which, upon transfer, it failed to disclose to them. This also was a proper ground of liability for the jury to consider. Restatement, Torts, s. 353; *McCabe* v. *Cohen*, 294 N. Y. 522; see also, *United States* v. *Inmon*, 205 F. (2d) 681, 684. The third and final basis of liability which the Court charged was that the company could be held if it knew or should have known that a danger might arise were the lower end of the penstock to become unsealed, and it nevertheless permitted junk dealers to remove equipment, unsealing this instrumentality to which the defendant had retained title, without seeing to it that they did this work properly or making any inspection to determine if there were seepage, after they had removed the waterwheel. We believe this too was correct. The underlying principle of our law of torts is that all who act must use reasonable care to avoid injury to others. *Brunel* v. *Association*, 95 N. H. 391, 394. Applying this test it was clearly findable that this defendant, who was well aware by virtue of its specialized

knowledge of the dangers of seepage, should have required the purchasers of the equipment to leave the penstock in a safe condition or should itself have taken preventive action after the work was done. Restatement, Torts, s. 412.

It appears that the Court committed no error in submitting in the terms in which it did the three grounds of recovery relied upon by the plaintiffs. In such cases as this, "it is immaterial whether the liability is based upon the principles of negligence or upon a theory of the improper use of land. In either case the liability is the product of the risk. To say that there is negligence in such cases is to say that there is nuisance." 65 Harv. L. Rev. 984, 986; see also, 24 Ind. L. J. 402, 410-411. Whether any or all of the plaintiffs' factual claims were sustainable was for the jury to determine. No reason exists why the plaintiffs "might not rely upon each and recover upon one or the other as the facts should prove to be." *Robertson* v. *Monroe*, 80 N. H. 258, 262.

A final question is whether the defendant company was entitled to a *remittitur* of $1,000 as ordered by the Court since the *ad damnum* in the case of the plaintiff, Florence M. Rideout, was for only $10,000, while her verdict was for $11,000. We are unable to see here where any rights of the defendant could be prejudiced by granting the plaintiff's motion after verdict for an increase in the amount of the *ad damnum*. The jury, while not advised of the amount of the *ad damnum,* presumably awarded compensatory damages only in accordance with the Court's instruction. *State* v. *Ellard,* 95 N. H. 217, 221, and cases cited. Had the motion been made before the verdict, it clearly should have been allowed. See *Morency* v. *Plourde,* 96 N. H. 344. Under our practice no reason appears in the circumstances here why the motion should not have been granted after the verdict. The early cases cited by the defendant are not now controlling under our liberal practice. RSA 514:9. Furthermore, the verdicts total less than the aggregate of the amounts of the *ad damna* and there is nothing to suggest that the company's defense would have been any different had the *ad damnum* in Mrs. Rideout's case originally been $11,000. The plaintiff's exceptions to the refusal of the Court to grant her motion to increase the *ad damnum* and to the granting of the defendant's motion for a *remittitur* are sustained and her case is remanded for the entry of appropriate orders.

In view of the result reached, no occasion appears for discussing the questions raised by the defendants Bowman and the town of

Swanzey in whose favor the jury returned verdicts. An examination of the record disclosed no further exceptions of merit by the defendant company and the order is

> *In the action of Florence M. Rideout v. Public Service Company of New Hampshire, remanded; in all other actions, judgment on the verdicts.*

All concurred.