Rockingham
No. 83-392

DROP ANCHOR REALTY TRUST<br>
CHARLOTTE MARSHALL, TRUSTEE

v.

HARTFORD FIRE INSURANCE COMPANY &amp; a.

July 1, 1985

676

*Steven Eric Feld*, of Portsmouth, by brief and orally, for the plaintiff.

*Boynton, Waldron, Doleac, Woodman & Scott P.A.*, of Portsmouth (*Ralph R. Woodman* on the brief and orally), for the defendants.

BATCHELDER, J. This action arose from damage to the Drop Anchor Motel (the motel), which is owned by the plaintiff. Located on Ocean Boulevard in Hampton Beach, the motel sustained extensive wind and water damage during the blizzard of 1978. At the time of the blizzard, insurance policies with the defendants covered damage to the property from a variety of causes, including damage due to wind, but not damage due to flooding. During the course of this dispute, the central question has been whether the damage sustained in the blizzard was due to wind or to flooding. In these cross appeals by both parties from a verdict in favor of the plaintiff, we affirm in part, reverse in part, and remand.

On January 29, 1982, after unsuccessful attempts by the parties to reach an agreement on the amount of damages compensable under the policies, the plaintiff filed suit in superior court, alleging that the defendants had in bad faith failed to satisfy their obligations under the policies. During the course of the trial, the plaintiff moved to amend the *ad damnum* by increasing it to $100,000 from $75,000. The Court (*Contas*, J.) failed to rule on the motion.

At the close of the plaintiff's case, the defendants moved for a directed verdict, alleging, among other things, that the plaintiff had not sustained its burden on the issue of consequential damages. The motion was denied, subject to the defendants' exception.

The trial was held before a jury which, by special verdict, found that the plaintiff was entitled to compensatory damages in the amount of $12,000 and to damages due to the bad faith of the defendants in the amount of $12,000.

After the trial, the defendants' attorneys, Ralph R. Woodman and Patti Blanchette, conversed with several of the jurors in the court parking lot. Using information he had learned as a result of this conversation, Attorney Woodman the next day filed a motion to reconvene the jury, together with a supporting affidavit which stated that the jurors had indicated that the jury had improperly calculated the amount of damages by factoring in 15% interest. Four days later, the court held a hearing on the motion. Over the plaintiff's objection, the court reconvened the jury for the purpose of answering special questions as to whether it had included interest in the verdict. When the jury responded that $10,000 in interest had been included, the court remitted the verdict in that amount.

In a subsequent order dated August 30, 1982, the court found that the defendants had in bad faith prolonged the litigation and were thus liable to the plaintiff for its reasonable attorney's fees and litigation expenses. The court awarded the plaintiff $11,710.26 for such fees and expenses.

On appeal, both parties claim that the trial court committed reversible error. The defendants challenge both the denial of their motion for a directed verdict on the issue of consequential damages and the award of attorney's fees to the plaintiff. The plaintiff objects to the amount of the attorney's fees awarded and to the failure of the trial court to rule on its motion to amend the *ad damnum*, and raises several issues concerning the trial court's remittitur order.

■■ The defendants moved for a directed verdict with respect to the three types of consequential damages claimed by the plaintiff: increased insurance premiums, loss of good will and business reputation, and lost profits for the 1978 season. A defendant is entitled to a directed verdict if "the plaintiff offers no evidence from which reasonable men can infer the burden of proof has been sustained." *Williams v. Duston*, 79 N.H. 490, 491, 111 A. 690, 691 (1920). In reviewing the denial of a directed verdict, we "consider the evidence most favorable to the plaintiff." *Sargent v. Alton*, 102 N.H. 476, 478, 160 A.2d 345, 346 (1960). "We will not upset denials of motions for nonsuit, dismissal, directed verdict, or judgment n.o.v. where there is sufficient evidence in the record to support the ruling." *Reid v. Spadone Mach. Co.*, 119 N.H. 457, 462, 404 A.2d 1094, 1097 (1979). We address each of the three types of consequential damages claimed by the plaintiff in turn, beginning with the claim of consequential damages for increased insurance premiums.

After the plaintiff instituted the present action, the defendants notified the plaintiff that one of its policies with the defendants had been cancelled and that the remaining policies would not be renewed, thus forcing the plaintiff to obtain new insurance. The evidence clearly established that the premiums under the new insurance policies were higher than the premiums under the policies with the defendants.

■■ Consequential damages are reasonably foreseeable losses that flow from a breach of contract. *Petrie-Clemons v. Butterfield*, 122 N.H. 120, 124, 441 A.2d 1167, 1170 (1982). In the instant case, the plaintiff alleged that the defendants had breached their contractual obligation to compensate the plaintiff for damages compensable under the policies; that the defendants, in their handling of the plaintiff's claims, had failed to comply with their implied obligations of good faith and fair dealing; and that the defendants' failure to satisfy the plaintiff's claims in good faith had caused the claimed consequential damages. The plaintiff presented no evidence, however, that the consequential damages with respect to increased insurance costs had flowed from the alleged breach of the defendants'

obligation to settle the plaintiff's compensable claims. Although the increased cost of insurance resulted from the defendants' cancellation or nonrenewal of the policies, the plaintiff never claimed that the insurance cancellation and nonrenewals themselves amounted to a breach of the defendants' contractual obligations. Since no evidence was presented that the increased insurance costs resulted from the claimed contractual breach, the defendants were entitled to a directed verdict with respect to this aspect of the claimed consequential damages. We now turn to the consequential damages claimed for loss of good will and business reputation and for lost profits.

At trial, evidence was presented that, as a result of the deteriorated condition of the property, the plaintiff was ousted from the Hampton Beach Chamber of Commerce, thereby denying the plaintiff the benefit of inclusion in chamber advertisements and forcing it to expend $1,500 in advertising; that complaints about the condition of the premises were made to Mr. and Mrs. Fiurmas, the managers of the motel, and to the chamber of commerce; and that the rental income per available unit sharply dropped during the 1978 season. In light of this evidence, we find that the trial court properly denied the defendants' motion for a directed verdict with respect to the claimed damages for loss of good will and reputation and for lost profits.

The court's award of attorney's fees presents two issues for review. The first is whether the evidence supported the findings by the jury and by the court of bad faith on the part of the defendants. If these findings were proper, we must also decide whether the amount of fees awarded was reasonable. We affirm on both issues.

"Where an individual is forced to seek judicial assistance to secure a clearly defined and established right, which should have been freely enjoyed without such intervention, an award of counsel fees on the basis of bad faith is appropriate." *Harkeem v. Adams*, 117 N.H. 687, 691, 377 A.2d 617, 619 (1977). Thus, we have held that an "insured is entitled to attorney's fees 'if the insurer acted in bad faith in promoting unnecessary litigation.'" *Johnson v. Phenix Mut. Ins. Co.*, 122 N.H. 389, 394, 445 A.2d 1097, 1099 (1982) (quoting *Lawton v. Great Southwest Fire Ins. Co.*, 118 N.H. 607, 615, 392 A.2d 576, 581 (1978)). "Whether the defendant's delay was in fact in bad faith . . . [is a] question [—] for the jury." *Lawton v. Great Southwest Fire Ins. Co., supra* at 612-13, 392 A.2d at 580.

In reviewing the reasonableness of the findings of bad faith

by the jury and by the court, we note that "serious financial injuries may often result from an insurer's refusal or delay to make payment." *Id.* at 611, 392 A.2d at 579. We also recognize that "'[w]here the owner of a heavily mortgaged motel or other business property suffers a substantial . . . loss, the owner may be placed in financial distress . . . .'" *Id.* (quoting *Reichert v. Gen. Ins. Co. of America,* 59 Cal. Rptr. 724, 728, 428 P.2d 860, 864 (1967)). For these reasons, an insurer is not permitted to delay payment "to coerce the insured into accepting less than full performance of the insurer's contractual obligations . . . ." *Id.* at 612, 392 A.2d at 580.

To determine whether the defendants breached their obligations of good faith and fair dealing, we examine one measure of the defendants' good faith: the settlement history of the case. In gauging the reasonableness of the defendants' settlement offers, we examine them in light of the jury's award of $14,000 in damages.

The premises were inspected by agents of the defendants on April 28, 1978. At that time, a settlement offer of $3,000 was made. Over the next several weeks, the defendants' estimate of covered damages was increased to $5,100 and then to $5,500. The amount of recovery that the plaintiff could have obtained under these estimates would have been reduced by depreciation and by the amount of the insured deductibles under the policies. When suit was filed the following January, the defendants paid into court $5,500 as the acknowledged value of the plaintiff's claim. No further settlement offer was made until April 26, 1982, when the defendants offered $16,000 in response to the plaintiff's January 8, 1982 demand of $30,000. During the remainder of the case, the defendants' offer remained unchanged, while the plaintiff's demands escalated.

Although the record reveals that the conduct of both parties contributed to the delays that have plagued this case, we find that the court and jury could reasonably have construed the evidence to find bad faith on the part of the defendants. The settlement offers made in the spring of 1978, when measured against the jury verdict, as reduced by a reasonable amount for the consequential damages sustained in the summer of 1978, indicate that these offers could have been fairly regarded as unreasonably low, and as intended "to coerce the insured into accepting less than full performance of the insurer's contractual obligation . . . ." *Lawton v. Great Southwest Fire Ins. Co.,* 118 N.H. 607, 612, 392 A.2d 576, 580 (1978) (citations omitted). The plaintiff depended on the summer tourist trade for the bulk of its income. The severely damaged condition of the motel and the nearness of the summer season sharply reduced the strength of

the plaintiff's bargaining position with respect to the defendants. We hold that the evidence could reasonably be construed to establish that the defendants took unfair advantage of the plaintiff's weakened position by making settlement offers that were intended to force the plaintiff to accept less than the true value of its compensable losses. We therefore affirm the findings of bad faith.

 Since we uphold the findings of bad faith, we next address the reasonableness of the award of attorney's fees. The court awarded the plaintiff $11,710.26 in counsel fees and litigation expenses. On appeal, the plaintiff argues that the award was insufficient. We disagree.

In *In re Bergeron Estate*, 117 N.H. 963, 380 A.2d 678 (1977), this court stated:

> "[t]he determination of reasonable compensation for the attorney [is] a matter resting within the sound discretion of the . . . court. Among the factors to be considered are the amount involved, the nature, novelty, and difficulty of the litigation, the attorney's standing and the skill employed, the time devoted, the customary fees in the area, the extent to which the attorney prevailed, and the benefit thereby bestowed on the client."

*Id.* at 967, 380 A.2d at 681 (citations omitted); *see also Couture v. Mammoth Groceries, Inc.*, 117 N.H. 294, 296, 371 A.2d 1184, 1186 (1977); *see* CODE OF PROFESSIONAL RESPONSIBILITY FOR NEW HAMPSHIRE LAWYERS DR 2-106(B). The trial court, in its order, detailed its calculations in arriving at the awarded amount and considered the circumstances of this case in light of the factors identified in *In re Bergeron Estate supra*. After reviewing the record, we conclude that the trial court did not abuse its discretion, and we therefore affirm the amount of the award.

The next issue we address is whether the trial court erred in failing to rule on the plaintiff's motion to amend the *ad damnum* to plead $100,000, instead of $75,000. The motion was made in response to the defendants' attempt at trial to prove, with the help of a photograph purportedly of a van identical to the Fiurmas' 1961 Ford van, that the property damage had been caused by flooding. In rebuttal, the plaintiff offered testimony that the photograph was in fact of a 1965 model van. On appeal, the plaintiff argues that the defendants' use of this photograph further indicated their bad faith and thus warranted the *ad damnum* amendment.

 Absent unfair prejudice to the opposing party, motions

to amend *ad damna* should be liberally granted. *See Valliere v. Filfalt*, 110 N.H. 331, 333–34, 266 A.2d 843, 845 (1970); *Haney v. Burgin*, 106 N.H. 213, 214–16, 208 A.2d 448, 450–51 (1965); *Derby v. Company*, 100 N.H. 53, 62, 119 A.2d 335, 343 (1955). Although granting of the plaintiff's motion might have been the proper course under this rule, we find no reversible error in the trial court's failure to rule on the motion. The plaintiff was free to argue, and the jury was free to infer, that the defendants' use of the photograph demonstrated their bad faith. The jury, however, turned in a verdict of only $14,000, well below the original *ad damnum* of $75,000. We therefore see no prejudice to the plaintiff in the court's failure to rule on the motion. *Cf. Derby v. Company supra* (denial of post verdict motion for increase in the *ad damnum* was error where verdict exceeded *ad damnum*).

The next issues raised by the parties concern the order of the court remitting the verdict by $10,000, the amount which the jury indicated it had included as interest in the original verdict. On appeal, the plaintiff argues that the court erred in three ways in its handling of this matter. We address the arguments in turn.

 The first error claimed by the plaintiff is that the court improperly received the affidavit of Attorney Woodman to impeach the verdict. The affidavit of a juror is inadmissible in evidence to impeach a verdict. *Bunnell v. Lucas*, 126 N.H. 663, 668, 495 A.2d 1282, 1285 (1985); *Leighton v. Sargent*, 31 N.H. 119, 137 (1855). Thus, the plaintiff argues that the affidavit of Attorney Woodman, which was based on hearsay juror declarations, was likewise inadmissible. We reject this argument because it lies on a faulty premise; namely, that the law of evidence governed the court's treatment of the affidavit.

 Although a juror's affidavit that impeaches a verdict is inadmissible in evidence, it may be considered by the trial court to determine whether the jury should be reconvened for questioning on the propriety of the conduct of their deliberations. *Bunnell, supra* at 668–69, 495 A.2d at 1285. "[T]he exercise of this power to recall and interrogate the jury does not depend upon the introduction before the court of legally competent evidence of their misconduct." *Caldwell v. Yeatman*, 91 N.H. 150, 155, 15 A.2d 252, 255 (1940); *see also Bunnell, supra* at 669, 495 A.2d at 1285. Thus, the admissibility of Attorney Woodman's affidavit was not controlling on the ability of the court to consider the affidavit for the purpose of reconvening the jury. *Cf. State v. Frazier*, 74 N.H. 112, 113, 65 A. 297, 298 (1906) (denial of motion to reconvene and interrogate jury based on attor-

ney's affidavit of jurors' hearsay declarations upheld as sound exercise of discretion). Since, in the instant case, the trial court considered Attorney Woodman's affidavit solely for the purpose of reconvening the jury, and not as an evidentiary basis for setting the verdict aside, we find no error in its actions in this regard.

■■■ The second error claimed by the plaintiff is that the reconvening of the jury was improper, given the lapse of five days since the close of trial and the discussion in the interim between several jurors and the defendants' counsel. Whether to reconvene the jury under these circumstances was a matter within the sound discretion of the trial court:

> "In some jurisdictions a recorded verdict cannot be amended by the jury after their separation; but in this state a different practice prevails. The error in this case could be corrected, whether the verdict had or had not been recorded, and whether the jury had or had not separated. Their separation increased the danger of wrong being done by their amendment of the verdict. The increased danger raised the question whether justice required a recommittal of the case for reconsideration, and when, on reconsideration, the verdict was amended, there was a question whether justice required a judgment on the amended verdict. Both questions were matters of fact to be determined at the trial term."

*Dearborn v. Newhall*, 63 N.H. 301, 302–03 (1884). Although the lapse of time since the close of trial and the exposure of jurors to the influence of defendants' counsel were factors to be considered by the trial court in determining whether to reconvene the jury, we cannot say that they militated so strongly against reconvening the jury as to require a reversal. We therefore affirm the trial court's decision in this respect.

In making this decision, we note that the problems posed by the lapse of time and the danger of undue influence on the jury are not as difficult in this case as in instances where a deliberative error requires resubmission of the case to a jury. Once the court in the instant case discovered that the jury had erred, it could correct the error by reducing the judgment amount. In some situations, however, such as where the jury assigns the burden of proof to the wrong party, who then loses, the case must be resubmitted to a jury if a proper jury verdict is to be rendered. In these situations, the court must evaluate the extent to which a lapse of time or an exposure to improper influences may have clouded the jurors' judgment

in order to determine not only whether to recall and interrogate the jury, but also, once a deliberative error is revealed, whether to submit the case to the old jury or to a new one. *See Winslow v. Smith*, 74 N.H. 65, 69–70, 65 A. 108, 110–11 (1906); *see also Tierney v. Granite Works*, 79 N.H. 166, 168, 106 A. 481, 482 (1919) (lapse of three days and disqualification of juror supported submission to a new jury).

The final error claimed by the plaintiff is that the court improperly ascertained the jury's miscalculation of the amount of damages by means of a special verdict, instead of a *voir dire* interrogation. Although a *voir dire* examination of the jury is the customary method of interrogation, *see, e.g., Bunnell v. Lucas*, 126 N.H. 663, 669, 495 A.2d 1282, 1285 (1985); *Eichel v. Payeur*, 106 N.H. 484, 486, 214 A.2d 116, 118–19 (1965); *Blodgett v. Park*, 76 N.H. 435, 438, 84 A. 42, 44 (1912), we see no error in the trial court's action. The meaning of the special verdict question was plain; there was little chance of a misunderstanding by the jurors of their task. Use of the special verdict form allowed the jury to answer candidly the inquiry of the court without being subjected to the inquisitorial atmosphere of a *voir dire* examination.

■■ We have elsewhere held that "trial judges have the inherent power to use special questions and verdicts . . . to aid in post-verdict review." *Thibault v. Sears, Roebuck & Co.*, 118 N.H. 802, 813, 395 A.2d 843, 850 (1978) (referring to "complicated or multiple count negligence or strict liability cases"). We see no basis for finding any prejudice to the plaintiff resulting from the selection of this means of interrogation. We therefore find that the use of the special verdict form as a means to interrogate the jury was an appropriate exercise of discretion.

■ Finally, we address the issue of post-verdict interviews of jurors by litigants, their agents, and their counsel. In the course of our deliberations on this case and on *Bunnell v. Lucas*, 126 N.H. 663, 495 A.2d 1282 (1985), we have determined that the courts should consider the adoption of rules governing such interviews. We therefore commit this subject to the consideration of the bench and bar for development of submissions to be made to the Advisory Committee on Rules. See SUP. CT. R. 51; *cf. Commonwealth v. Fidler*, 377 Mass. 192, 385 N.E.2d 513 (1979); *United States v. Kepreos*, No. 84-1051, slip op. at 13–15 (1st Cir. March 29, 1985).

*Affirmed in part; reversed in part; remanded.*

All concurred.