No. 05-323

IN THE SUPREME COURT OF THE STATE OF MONTANA

2006 MT 99

LISA BROTHERTON PUMPHREY,

        Plaintiff and Respondent,

   v.

EMPIRE LATH AND PLASTER, a
Montana Corporation, and RICK LEE PAGITT,

        Defendants and Appellants.

APPEAL FROM:    The District Court of the Thirteenth Judicial District,
                   In and For the County Yellowstone, Cause No. DV 03-1186,
                   Honorable Russell C. Fagg, Presiding Judge

COUNSEL OF RECORD:

        For Appellants:

                Randy J. Cox and Matthew B. Hayhurst, Boone Karlberg P.C.,
                Missoula, Montana

        For Respondent:

                Elizabeth A. Halverson, Elizabeth A. Halverson, P.C.,
                Billings, Montana

Submitted on Briefs:  February 8, 2006

Decided:  May 9, 2006

Filed:

_____
                          Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1     Lisa Pumphrey (Pumphrey) sued Rick Lee Pagitt and Empire Lath and Plaster (collectively, Empire) for negligence. A jury awarded Pumphrey $3.9 million. Empire now appeals. We affirm.

¶2     The dispositive issues on appeal are:

¶3     (1) whether the District Court erred in denying Empire's motion for an independent medical examination pursuant to Rule 35, M.R.Civ.P.; and

¶4     (2) whether the District Court had authority to reconvene and re-poll the jury after discharging the jurors.

## FACTUAL AND PROCEDURAL BACKGROUND

¶5     This cause of action arose out of an automobile accident, wherein Pagitt, while in the course of his employment for Empire, negligently drove a pickup truck into the rear end of Pumphrey's stopped SUV. The collision propelled Pumphrey's SUV into the vehicle of her then-fiancé, Sean Pumphrey. The collision totaled all three vehicles and injured Pumphrey.

¶6     Pumphrey suffered injury to her neck and back and was later diagnosed with two herniated discs and dislocated ribs. A doctor testified that Pumphrey would likely endure life-long pain due to her injuries. Witnesses testified that the chronic pain that Pumphrey suffered ultimately caused her to withdraw from law school and has prevented her from pursuing gainful employment. Additionally, according to her own testimony and that of her doctors, Pumphrey cannot even exercise, let alone participate in the recreational

2

activities—backpacking, kayaking, mountain biking, and running—that she had so enjoyed before the accident.

¶7 In January 2004, Empire admitted that Pagitt negligently caused the accident. Therefore, as Empire acknowledges on appeal, "[t]he central issues at trial were causation and damages." Indeed, Empire identified only three issues of fact in the pre-trial order: the degree of severity and permanency of Pumphrey's injuries; whether the accident caused Pumphrey's present injuries; and the proper measure of damages.

¶8 On May 7, 2004, the court filed a scheduling order, setting a trial date of January 3, 2005. The court set October 11, 2004, as the deadline for disclosing experts, pursuant to Rule 26(b)(4)(A)(i), M.R.Civ.P. The court set October 25, 2004, as the deadline for disclosing rebuttal experts and November 8, 2004, as the close of discovery. The scheduling order provided that these deadlines "may be modified upon **mutual** agreement of the parties, in writing."

¶9 On October 8, 2004, in accordance with the scheduling order, Pumphrey filed expert disclosures with the court. Pumphrey identified six potential expert witnesses and, in accordance with Rule 26(b)(4)(A)(i), MCA, specified the subject matter on which each would testify, the substance of the facts and opinions to which each would testify, and provided the bases for such opinions.

¶10 Meanwhile, on October 6, 2004, Empire's counsel sent a letter to Pumphrey's counsel, requesting that Pumphrey submit to an independent medical examination (IME) by Dr. John Taylor, a neurologist. Pumphrey's counsel refused the following day, at

3

which point Empire had four days remaining to disclose Dr. Taylor as an expert, or eighteen days within which to disclose him as a rebuttal expert. Empire did neither. On October 28, 2004, Empire moved the court to order Pumphrey to submit to an IME as well as to extend the deadline for disclosure of rebuttal experts so that Empire could properly disclose the anticipated testimony of Dr. Taylor, following his examination of Pumphrey. In its motion, Empire noted that "the entire case may ultimately turn on two issues: (1) the severity and extent of [Pumphrey's] claimed injuries; and (2) whether her claimed injuries were, in fact, actually caused by the accident at issue."

¶11    By the deadline for disclosing rebuttal experts, Empire had not formally disclosed Dr. Taylor as an expert witness pursuant to Rule 26(b)(4), M.R.Civ.P. Consequently, the court denied Empire's motion for an IME and extension of the disclosure deadline, noting that Empire failed to provide sufficient justification for its failure to meet the scheduling deadline and that Pumphrey would suffer hardship if forced to prepare a response to the IME shortly before trial. The court indicated that "the main reason for the court-imposed deadlines" is preventing the difficulties inherent in coordinating an IME at the last minute. Although Empire argued that Pumphrey's counsel "led [Empire] to believe that an IME would be permitted," and that the deadline for an IME would be extended, the court noted that Empire did not point to any writing evincing that purported inclination.

¶12    After a two and a half day trial, the jury returned a verdict in favor of Lisa Pumphrey, awarding her $3.9 million in special damages. After the court announced the verdict, counsel for Empire requested that the court poll the jury, pursuant to § 25-7-501,

4

MCA. The clerk then reread the verdict and addressed each juror in turn. The clerk asked each of the first two jurors, "is that your verdict, [Jane Doe]?" As to the remaining nine jurors, the clerk simply read their names. According to the poll, eleven jurors agreed to the verdict and only one disagreed. The judge then discharged the jurors, informing them:

> now you can talk to anybody you wish about the case and you can tell them anything you wish about the case. The attorneys or their representatives might contact you and it is fine for you to talk to them, and in fact, you can talk to them about things you discussed. . . . Again I want to thank you very much for your time and work in this case. . . . Court is in recess.

¶13    A short while after the jury had been discharged and several jurors had left the courtroom, some jurors told the bailiff that they had misunderstood the polling question. Their confusion stemmed from the clerk's use of the ambiguous possessive pronoun "your." According to the foreperson, some of the jurors thought that they were being asked whether the verdict, as read in court, correctly reflected the verdict that the entire jury had reached, rather than whether they personally agreed with the verdict. The court then reconvened and reassembled ten of the jurors for the purpose of re-polling them. Two jurors had already left the premises. Counsel for Pumphrey quarreled with the court over the legality of this procedure, observing that the defendants had not objected to the initial polling process and that in the absence of any objection, "[i]t was my understanding that the jury was dismissed and that the record was closed as far as the trial is concerned." Nevertheless, the court reassembled the remaining jurors and, at the suggestion of Empire's attorney, proposed immediately re-polling the ten jurors who

5

were present. With respect to the court's suggestion to proceed with re-polling in this particular manner—immediately re-polling ten of the twelve jurors—Pumphrey's counsel expressed no objection. The re-polling resulted in six persons voicing agreement with the verdict and four voicing disagreement with the verdict.

¶14 The following day, the court reconvened to re-poll the two absconding jurors. At the outset of the proceedings, counsel for Pumphrey "[i]n an abundance of caution . . . reiterate[d her] objection on the record." She noted that "[t]he correct and valid verdict was entered in this case yesterday. At the Defendant's request, the jury was polled, the verdict was affirmed, and therefore the verdict was complete. This Court then appropriately discharged the jury. . . . [T]hese proceedings are unnecessary and contrary to law." Counsel for Empire indicated that he had shared an elevator with these two individuals following the discharge of the jury and "did engage both jurors in a brief conversation" about the damages calculation in the case. Counsel later characterized this interaction as "a several minute conversation [that] constituted substantial interaction between counsel and jury members . . . before the re-polling took place." Nevertheless, the two were re-polled, and one of them agreed with the verdict and the other disagreed, bringing the total tally in the second poll to seven jurors in agreement and five in disagreement with the verdict.

¶15 The court then decided to re-poll the jury once more. The court re-assembled all twelve jurors and, over objection from both parties, re-polled them. Nine expressed agreement with the verdict and only three expressed disagreement. The court accepted

this as a valid poll of the jury, denied Empire's subsequent motion for a new trial and entered judgment in favor of Pumphrey for $3.9 million.

## STANDARDS OF REVIEW

¶16 We employ an abuse of discretion standard when reviewing a district court's ruling on a request for an IME, pursuant to Rule 35, M.R.Civ.P., *Henricksen v. State*, 2004 MT 20, ¶ 51, 319 Mont. 307, ¶ 51, 84 P.3d 38, ¶ 51, and when reviewing the sanction a district court imposes for violation of a scheduling order, *McKenzie v. Scheeler* (1997), 285 Mont. 500, 507, 949 P.2d 1168, 1172. "A court abuses its discretion if it acts arbitrarily without employment of conscientious judgment or exceed[s] the bounds of reason resulting in substantial injustice." *McDermott v. Carie*, 2005 MT 293, ¶ 10, 329 Mont. 295, ¶ 10, 124 P.3d 168, ¶ 10 (quotations omitted, alteration in original).

¶17 We review a district court's conclusions of law to determine whether the district court's interpretation of the law is correct. *Chase v. Bearpaw Ranch Ass'n*, 2006 MT 67, ¶ 14 331 Mont. 421, ¶ 14, __ P.3d __, ¶ 14. Whether a discharged jury retains authority to revisit, alter or amend its verdict is a question of law.

¶18 We review a district court's denial of a motion for a new trial for a manifest abuse of discretion. *Bailey v. Beartooth Communications Co.*, 2004 MT 128, ¶ 10, 321 Mont. 305, ¶ 10, 92 P.3d 1, ¶ 10.

## DISCUSSION

*Issue 1: Whether the District Court erred in denying Empire's motion for an independent medical examination pursuant to Rule 35, M.R.Civ.P.*

7

¶19   Empire argues that the central issues at trial were causation and damages, specifically the extent and severity of Pumphrey's injuries and whether they resulted from the collision with Pagitt.  Empire notes that Pumphrey placed her physical condition in controversy; therefore, Rule 35, M.R.Civ.P., provides that Empire may conduct an IME.  Empire contends that its request for an IME, submitted prior to the close of discovery, was timely and proper under *Henricksen*.  Finally, Empire maintains that it informally requested an IME and informally identified Dr. Taylor as the expert who would perform the IME before the deadline for expert disclosure.

¶20   Pumphrey argues that the District Court properly exercised its broad discretion in enforcing the scheduling order.  Pumphrey notes that Empire agreed to the scheduling order in May 2004.  Pumphrey distinguishes *Henricksen* because there the State timely disclosed its expert.  Finally, Pumphrey suggests that Dr. Taylor, an undisclosed expert, could not have testified at trial, so there was no reason for him to perform an IME.

¶21   Empire sought to have Dr. Taylor perform a neurological examination of Pumphrey.  Given that the sole issues at trial were causation and damages, we presume that Dr. Taylor would have focused on these issues.  It is beyond cavil that a witness who performs a neurological examination and testifies concerning the results thereof, deducing the potential causes of injuries and extrapolating long-term health effects therefrom, qualifies as an expert witness.

¶22   Pursuant to the scheduling order, Empire had until October 25, 2004, to disclose Dr. Taylor as a rebuttal expert.  On October 6, 2004, Empire did provide Pumphrey with

informal notice that it wished to have Dr. Taylor perform an IME. Given that it was not served on Pumphrey, filed with the court, made under oath or subject to sanctions provided for by Rule 11, M.R.Civ.P., such informal notice does not comply with the scheduling order, which contemplates formal disclosure, pursuant to Rule 26(b)(4)(A)(i), M.R.Civ.P. Empire never formally disclosed Dr. Taylor as an expert. Indeed, not until three days after the deadline for disclosing rebuttal experts did Empire actually move the court to order an IME, thereby first informing the court (albeit indirectly) of its intention to call Dr. Taylor as an expert witness.

¶23 Relying on *Henricksen*, Empire argues that the District Court abused its discretion by declining to order an IME when Empire submitted its formal request for such an order prior to the close of discovery. Empire's reliance on *Henricksen* is inapposite. In *Henricksen*, we held that the District Court abused its discretion when it declined to order an IME despite the State's having formally issued a request for such nine days before the close of discovery. ¶ 55. We noted that "[a]n IME need not be conducted by the date set for expert disclosures." *Henricksen*, ¶ 59. Our holding in *Henricksen*, however, was premised on the fact that the State was surprised by Henricksen's last-minute revelation that she would seek to recover on the basis of suffering from post-traumatic stress disorder. ¶ 55. Moreover, *Henricksen* presupposes that the party requesting an IME has, pursuant to Rule 26(b)(4)(A)(i), M.R.Civ.P., formally and timely disclosed the expert who will conduct the IME. ¶¶ 53, 59, 60.

9

¶24 Here, in contrast, Empire never formally disclosed Dr. Taylor as an expert and alleges no surprise concerning the nature of Pumphrey's injuries. Accordingly, the court did not err in denying Empire's motion requesting an IME. *See Miranti v. Orms* (1992), 253 Mont. 231, 235, 833 P.2d 164, 166 (allowing two undisclosed experts to testify constitutes an abuse of discretion, notwithstanding plaintiff's assertion that defendant "knew" that they would testify as experts); *see also United First Fed. S & L v. White-Stevens* (1992), 253 Mont. 242, 247-48, 833 P.2d 170, 173-74 (allowing undisclosed experts to testify constitutes abuse of discretion). Because the court could have properly prevented Dr. Taylor from testifying, ordering Pumphrey to undergo an IME performed by Dr. Taylor would serve no conceivable purpose.

¶25 Assuming, *arguendo*, that Empire formally disclosed Dr. Taylor when it moved the court to order Pumphrey to submit to an IME, such an untimely formal disclosure would only enable Dr. Taylor to testify if the delay were attributable to surprise caused by Pumphrey or some other good cause. *See, e.g.*, *Mason v. Ditzel* (1992), 255 Mont. 364, 370, 842 P.2d 707, 711-12 (allowing an untimely disclosed psychiatric expert to testify for the defendant because the plaintiff's failure to fully disclose her past medical providers contributed to the defendant's tardy realization that testimony from a psychiatric expert would prove useful); *see also* Rule 16(b), M.R.Civ.P. ("[a] schedule shall not be modified except by leave of the judge upon a showing of good cause"); *McKenzie*, 285 Mont. at 507, 949 P.2d at 1172 (bestowing discretion on a district court to impose sanctions for violations of a scheduling order). Empire asserts no surprise as to

10

the extent or severity of Pumphrey's injuries, nor does it provide any other good cause for not complying with the scheduling order. While this Court may have imposed a different sanction, we cannot say that the District Court abused its discretion by denying Empire's request for an IME in response to Empire's disregard of the scheduling order.

¶26 Empire never formally disclosed Dr. Taylor as an expert pursuant to Rule 26(b)(4), M.R.Civ.P. Even if we treated Empire's motion requesting an IME as an untimely formal disclosure, Empire does not attribute the tardiness of such "disclosure" to surprise or any other good cause. Accordingly, we hold that the District Court properly exercised its discretion when it denied Empire's motion for an IME.

*Issue 2: Whether the District Court had authority to reconvene and re-poll the jury after discharging the jurors.*

¶27 Empire argues that the court properly reassembled and re-polled the jury. Empire maintains that Pumphrey, by failing to object to re-polling the jury, acquiesced to the process and waived any right to appeal the issue. Based on caselaw from other jurisdictions, Empire suggests that even if Pumphrey had objected, the court had authority to re-poll the jury, notwithstanding counsel's *ex parte* contact with individual jurors. Empire insists that only the second jury poll represented a valid poll. Thus, Empire suggests, the District Court should have declared a mistrial, rather than poll the jurors for a third time.

¶28 Pumphrey argues that the District Court correctly entered the verdict initially announced by the jury and confirmed by the initial poll of the jurors. Pumphrey stresses

11

that she immediately objected to the court's decision to reconvene the ex-jurors for further polling. Pumphrey maintains that once the jury was discharged, it lost authority to alter the verdict—the twelve individuals no longer comprised a jury.

¶29 Whether a trial court has authority to reassemble and poll jurors after previously discharging the jury is a question of first impression in Montana. Our resolution of this issue is aided by recognition that re-polling the jury potentially results in altering the verdict.

¶30 In light of the novelty of the situation she faced, we consider Pumphrey's protestations against the proposed reassembly and re-polling of the jurors to constitute an adequate objection. We will consider an objection sufficient if it specifies the reason for disagreement with the procedure employed by the court. *See, e.g.*, *Adams and Gregoire, Inc. v. National Indemnity Co.* (1962), 141 Mont. 103, 110, 375 P.2d 112, 116 ("mere objection without assignment of the specific reason for the objection is not a proper objection"). Although she did not utter the magic word "objection," Pumphrey's counsel clearly expressed her disagreement with the procedure and adequately specified the basis therefore—that Empire had not objected to the initial poll of the jurors and that the court had consequently discharged the jury, marking completion of the trial. Only after it became apparent that the court would re-poll the jurors, did Pumphrey indicate that she did not object to the *specific* proposal to immediately poll ten of the twelve jurors. We conclude that Pumphrey did not waive her right to appeal the propriety of reassembling and re-polling the jurors following their discharge.

¶31 It is evident that the statute authorizing a district court to poll jurors presupposes that the jury remains impaneled at all times before it is polled. Section 25-7-501(2), MCA, provides:

> Either party may require the jury to be polled, which is done by the court or clerk asking each juror if it is his [or her] verdict. If upon such inquiry or polling more than one-third of the jurors disagree thereto, the jury must be sent out again, but if no such disagreement be expressed, the verdict is complete and the jury discharged from the case.

The statute plainly contemplates that jury polling will precede the discharge of the jury. Although it has been re-enacted many times during the past century, the Legislature last amended this statute in 1895. At that time, the law provided that the jury's authority terminated upon discharge. *See Morris v. Burke* (1895), 15 Mont. 214, 215, 38 P. 1065, 1066 (quoting *In re Thompson* (1890), 9 Mont. 381, 388, 34 P. 933, 934) ("[w]hen the verdict is rendered and recorded, and the jury discharged, the jury is *functus officio*. Prior to that time the verdict is in control of the jury in some respects. After those events the province of the jury is exhausted"). We presume that the legislature is cognizant of existing law. *Matter of Investigative Records* (1994), 265 Mont. 379, 382, 877 P.2d 470, 472. Had the legislature intended to modify existing law in order to provide courts with authority to poll a jury after discharging the jurors, it would have provided for this contingency when it amended the statute.

¶32 Subsequent to 1895, this Court has consistently held that the court effectively nullifies a jury's authority when it discharges the jurors. *See Fauver v. Wilkoske* (1949), 123 Mont. 228, 236-37, 211 P.2d 420, 425 ("[t]he time for correcting an insufficient

13

verdict is . . . before the jury has been discharged from the case"); *see also Poor v. Madison River Power Co.* (1910), 41 Mont. 236, 243, 108 P. 645, 648 ("[the jury] had been finally discharged from consideration of the case, with the result that they had become again members of the community at large, freed from the obligations of their official oaths, and could not have been recalled except upon consent of all the parties"); *cf. Gilmore v. Mulvihill* (1940), 109 Mont. 601, 98 P.2d 335 (affirming the court's alteration of a facially deficient verdict following the discharge of the jury). Moreover, we have explained that "[i]f after being discharged and mingling with the public, jurors are permitted to impeach verdicts which they have rendered, it would open the door for tampering with jurors and would place it in the power of a dissatisfied or corrupt juror to destroy a verdict to which he had deliberately given his assent under sanction of an oath . . . ." *Estate of Spicher v. Miller* (1993), 260 Mont. 504, 507, 861 P.2d 183, 185 (ruling on the admissibility of juror affidavits to impeach a verdict, pursuant to Rule 606(b), M.R.Evid.). This rationale applies equally to polling discharged jurors who have dispersed.

¶33 In ascertaining the court's authority to reassemble discharged jurors in order to revisit the verdict, we abide by this Court's existing precedent and supporting rationale, while seeking further guidance from other courts. In *Spears v. Mills* (Ark. 2002), 69 S.W.3d 407, after the court announced a verdict, neither party requested that the court poll the jurors and the court discharged the jurors. Subsequently, the jurors alerted the bailiff that there had been a misunderstanding that affected the validity of the verdict, and

14

the court reassembled the jury. The foreman indicated that the jury had not had contact with any non-juror. The polling revealed that a majority of jurors disagreed with the verdict. The court sent the jury back for additional deliberations, and they returned with an amended verdict. *Spears,* 69 S.W.3d at 409-10. The Supreme Court of Arkansas held that the trial court erred in polling the jurors following their discharge and dispersal. The court declared "paramount" its concern that the jury remain "free from even the appearance of taint or outside influences." *Spears*, 69 S.W.3d at 413. Consequently, the court held, once discharged, a jury may only correct or amend its verdict if it has "not left the presence of the trial court and mingled with bystanders. . . . [M]ingling occurs once the individual jurors have been discharged from their oath and duties as jurors and have left the presence, control, and supervision of the court." *Spears*, 69 S.W.3d at 412.

¶34    The rule articulated in *Spears* comports with existing Montana law, but provides a narrow exception in cases where the jury could not have been subjected to any outside influence after being formally discharged. This exception strikes the proper balance between the pursuit of substantive justice and the need to maintain confidence in the sanctity of jury verdicts by ensuring that the "fountain of justice" remains pure. *Melton v. Commonwealth* (Va. 1922), 111 S.E. 291, 293. Finally, it embraces the rationale this Court expressed in *Estate of Spicher*. Therefore, we adopt the rule that a jury lacks any authority to revisit, alter or amend its verdict—including via juror polling—after the trial court has discharged the jurors and any of them have left the presence, control and supervision of the court.

15

¶35    Indeed, several of the non-Montana cases that Empire cites, which it claims support the court's authority to re-poll the jurors after discharging the jury, resonate generally with *Spears*.  The majority of these courts allow a jury to alter its verdict only if the jurors have not dispersed or commingled with non-jurors after being discharged.  *See Newport Fisherman's Supply Co. Inc. v. Derecktor* (R.I. 1990), 569 A.2d 1051, 1053 (allowing a discharged jury to amend a verdict when the jurors had not contacted either party and "remained an undispersed unit within the control of the court" because no "extratrial influence [could have infected] the sanctity of the jury's secrecy between the time of discharge and reassembly"); *see also Lapham v. Eastern Mass. St. Ry. Co.* (Mass. 1962), 179 N.E.2d 589, 591 (permitting the jury to reassemble and correct a defective verdict after being discharged and separating "if the judge determines that nothing prejudicial to the cause of justice occurred during the separation"); *Sierra Foods v. Williams* (Nev. 1991), 816 P.2d 466, 467 (creating an exception to the general rule that "a trial court is without authority or jurisdiction to reconvene a jury once it has been dismissed," in situations "when the jury has not yet dispersed or lost its separate identity and when the [party opposed to reconvening the jury] has presented no proof of outside influence"); *McCauley v. Charter Oak Fire Ins. Co.* (Tex. Ct. App. 1984), 660 S.W.2d 863, 865 ("[s]ince the jurors were still assembled in the courtroom and were under the control of the court, it is our view that the jury had not been discharged").  Empire also relies on two cases from jurisdictions whose law irreconcilably conflicts with existing Montana law on the jury's lack of authority to alter a verdict after it has been discharged.

16

*See Drop Anchor Realty Trust v. Hartford Fire Ins. Co.* (N.H. 1985), 496 A.2d 339, 345 (relying on *Dearborn v. Newhall* (N.H. 1884), 63 N.H. 301, 302-03, for the proposition that an error in a verdict can be corrected after discharge of the jury "whether the jury had or had not separated"); *see also Indus. Savings Bank v. Mitchell* (Ala. 1932), 140 So. 449, 452 (relying on Alabama's rule that a verdict has not been rendered until it has been accepted by the court to allow the jury to amend a facially defective verdict that had not yet been accepted by the court). To the extent that the non-Montana authorities on which Empire relies do not directly conflict with the existing Montana law, they fail to support Empire's position in this case.

¶36    Here, the jury rendered its verdict, which the court subsequently confirmed by polling the jurors. The court then discharged the jury, and the jurors left the courtroom. Two of the jurors conversed with Empire's counsel about the calculation of damages—a central issue in the case. Not only had the jurors left the presence and control of the trial court (allowing at least the appearance of taint) two of them had actually been subjected to the most pernicious of outside influences—*ex parte* discussion of the verdict with Empire's counsel. Having left the "presence, control, and supervision of the court," *Spears*, 69 S.W.3d at 412, the jurors could no longer correct their verdict. Consequently, the trial court erred as a matter of law when it reassembled the jury and polled the jurors for a second time.

¶37    Nevertheless, the District Court eventually polled the jury for a third time and ultimately entered the $3.9 million verdict initially reached by the jury. On the basis of

17

this final poll of the jurors, and the propriety of its earlier denial of Empire's request for an IME, the District Court denied Empire's motion for a new trial. We will not reverse a district court that reaches the correct result, even if for the wrong reason. *Palmer v. Bahm*, 2006 MT 29, ¶ 20, 331 Mont. 105, ¶ 20, 128 P.3d 1031, ¶ 20. Accordingly, we affirm the District Court's entry of the verdict and denial of Empire's motion for a new trial.

## CONCLUSION

¶38 Empire never formally disclosed Dr. Taylor as an expert witness. To the extent that Empire did provide formal, albeit indirect, notice that it would offer expert testimony from Dr. Taylor, it nonetheless failed to establish surprise or any other good cause for circumventing the court's scheduling order. Consequently, the District Court did not abuse its discretion when it declined to order Pumphrey to submit to an IME.

¶39 As soon as any discharged juror left the presence, control and supervision of the District Court, the court lost authority to re-empanel the jury and poll the jurors. The District Court erred in twice re-polling the jurors. Nevertheless, the court ultimately arrived at the correct result when it entered the initial verdict rendered by the jury and denied Empire's motion for a new trial.

¶40 We affirm.


/S/ W. WILLIAM LEAPHART


18

We concur:

/S/ JOHN WARNER
/S/ PATRICIA COTTER
/S/ BRIAN MORRIS
/S/ JIM RICE

Justice Jim Rice specially concurring.

¶41 I concur with the Court's opinion, and offer the following with regard to Issue #1.

¶42 Five days before the deadline for disclosing expert witnesses, Defendant's counsel wrote Plaintiff's counsel, requesting that the Plaintiff undergo an IME, which had been scheduled with Dr. Taylor for later in the month. Plaintiff's counsel refused to participate in the IME because "the deadline is upon us" and the IME proposal was "not workable." In its order denying Defendant's motion for an IME and for extension of the disclosure deadline, the District Court appears to have endorsed Plaintiff's refusal to participate, reasoning that the purpose of scheduling deadlines is to prevent "the difficulties inherent in coordinating an IME at the last minute." *See* ¶ 11.

¶43 I would merely offer that this opinion is about the sufficiency and timeliness of the actions which Defendant took *after* Plaintiff refused to participate in the requested IME. It says nothing about the validity of Plaintiff's refusal to participate in the near-deadline, yet timely, requested IME in the first place or about the validity of the District Court's rationale which approved the same.

/S/ JIM RICE