No. 87-459

IN THE SUPREME COURT OF THE STATE OF MONTANA

1988

---

DAVID ALARIC PALMER, a protected
person, by MARTHA ROSE DIACON, his
conservator,

         Plaintiff and Respondent,

   -vs-

FARMERS INSURANCE EXCHANGE,

      Defendant and Appellant.

---

APPEAL FROM:  District Court of the Eighth Judicial District,
In and for the County of Cascade,
The Honorable Thomas McKittrick, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Smith, Baillie & Walsh; William J. Gregoire argued,
and James R. Walsh argued, Great Falls, Montana

    For Respondent:

        Dennis P. Conner argued, Great Falls, Montana
John C. Risjord, Kansas City, Missouri

---

Submitted:   August 9, 1988

Decided:   September 13, 1988

Filed:  SEP 1 3 1988

*Ethel M. Harrison*

Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

The defendant, Farmers Insurance Exchange, appeals a 9-3 jury verdict from the Eighth Judicial District, Cascade County, finding it liable for $50,000 under two uninsured motorist policies to cover a motorcycle accident in which David Alaric Palmer suffered head injuries.

Palmer was injured on June 10, 1984, when his southbound 750-cc motorcycle went off the east side of U.S. 89 approximately fifteen miles north of White Sulphur Springs, Montana. His family subsequently filed claims for $25,000 in uninsured motorist protection on each of two policies issued by the defendant, claiming that a red semi tractor-trailer travelling north had forced Palmer off the road and had not stopped after the accident. The defendant refused the claims. It cited the Highway Patrol officer's report that attributed the accident to Palmer's recklessness and excessive speed. Neither Palmer, who is not able to recall the accident, nor the driver of the tractor-trailer, who was never identified or located, testified.

Serena Diacon was riding as a passenger on Palmer's motorcycle at the time of the accident and suffered only cuts and bruises. She testified at trial that Palmer was driving south at about 50 m.p.h. when they came to a right-hand curve in the highway. On the east side of this curve (to the left of Palmer's southbound motorcycle), Stud Horse Road enters the highway. Serena testified that Palmer was about two and one-half feet from the center line in his proper lane when she looked over Palmer's shoulder and saw the tractor-trailer "half in our lane and half in their lane." This northbound tractor-trailer, which was straddling the center line of the

2

highway, was travelling between 60 and 70 m.p.h., Serena testified. She said she ducked behind Palmer and braced herself as he swerved to the left; she could not say whether Palmer passed in front of or behind the tractor-trailer. The motorcycle travelled across the northbound lane of traffic, across the approach to Stud Horse Road, and flew off an adjacent embankment in pretty much of a straight line.

The only other witness to testify as to the position of the tractor-trailer was Frank Atchison, a water truck driver, who was following the tractor-trailer some 100 yards back. His testimony was that the tractor-trailer was so far to the right side of its proper lane of travel that it kicked up dirt and dust as it passed over the approach to Stud Horse Road. Through that dirt and dust, Atchison said he saw a "flash" that he thought was a motorcycle going off the road, but did not know whether it passed in front of or behind the tractor-trailer. Atchison stopped at Stud Horse Road, where he had planned to turn off originally, and helped Serena Diacon as she climbed up the embankment. Atchison testified that he was gaining on the tractor-trailer when the accident occurred and was driving 45 m.p.h. Thus, he said he believes the tractor-trailer was travelling no faster than 40 m.p.h. and believes the motorcycle was travelling more than 55 m.p.h. The defense presented other witnesses who testified that a red tractor pulling a trailer stopped several hundred yards north of the accident scene to inform them that he thought he had seen through his side mirrors a motorcycle going off the road behind him.

The investigating Highway Patrol officer diagrammed the scene and measured skid marks. He testified that the motorcycle's skid marks started just east of the center line (in the northbound lane), and extended in roughly a straight line off and on for 90 feet before reaching the dirt road,

3

and then the embankment. His measurements show that the motorcycle was airborne for twenty-eight feet from this point and rolled another twenty-four feet. The patrolman did not learn of the tractor-trailer's alleged involvement in the accident until one day later, when he talked to Serena. However, he inspected both lanes of traffic on the day of the accident and found no skid marks or other signs that a northbound vehicle had braked suddenly or hit any object. He testified that this indicates the motorcycle passed behind the tractor-trailer. Although his original report said the accident was caused by Palmer's excessive speed, he said at trial that he no longer has an opinion as to the cause of the accident.

The plaintiff presented various experts to testify as to the speed of the motorcycle. Professor Denman Lee, a Montana State University physicist, testified that the length of the skid marks, the height of the embankment, and the distance of flight indicated the motorcycle was travelling about 28 m.p.h. when it became airborne as it left the embankment, and about 48 m.p.h. at the point on the highway where it started to leave skid marks. Robert "Evil" Knievil, a motorcycle stunt driver, testified that had the motorcycle been travelling more than 25-30 m.p.h. when it left the embankment it would have been airborne farther. Also introduced as evidence were ambulance reports that indicated Palmer had been injured when his motorcycle left the road "at a moderate rate of speed" and a physician confirmed that Palmer's injuries were consistent with moderate speed, over defense's objection that such testimony was impermissible hearsay as well as irrelevant.

The defendant raises these issues:

1. Did the District Court err when it allowed medical evidence concerning the injuries even though the defendant had stipulated to the severity of the injuries?

2. Did the District Court err by allowing the plaintiff to display certain video tapes to the jury?

3. Did the District Court issue an improper "sudden emergency" instruction?

4. Did the District Court err in computing prejudgment interest?

We affirm on all counts except for the last one. We remand the court's order granting prejudgment interest for a new order consistent with this opinion.

This case presented difficulties in proof for both parties. In a sense each party was attempting to prove a negative since Palmer was asserting an unidentified tractor-trailer driver, not he, was responsible for the accident. In turn, the defendant asserted that this same unidentified tractor-trailer driver was nowhere near the center line of the highway, let alone straddling or crossing it. The jury voted 9-3 to accept Palmer's version.

This Court presumes the verdict of a jury properly instructed on the law to be correct and will accept the evidence in a light most favorable to the prevailing party. Mountain West Farm Bureau Insurance v. Girton (Mont. 1985), 697 P.2d 1362, 1363, 42 St.Rep. 500, 501. We do not disturb lightly the verdict of a competent jury, Gee v. Egbert (1984), 209 Mont. 1, 18-19, 679 P.2d 1194, 1203. Instead we determine if substantial credible evidence exists in the record to support that verdict and, if such evidence exists, to affirm. Clark v. Norris (Mont. 1987), 734 P.2d 182, 184-85, 44 St.Rep. 444, 445; Gibson v. Western Fire Insurance Co. (Mont. 1984), 682 P.2d 725, 736, 41 St.Rep. 1048, 1058; Wilhelm v. City of Great Falls (Mont. 1987), 732 P.2d 1315,

1321, 44 St.Rep. 211, 218. However, we emphasize that because the questions of fact in this case are so close, we will afford the jury that heard the evidence the utmost discretion. This is not to be read as an endorsement of the jury's verdict since we may well have decided differently on the facts of the case.

## Medical Evidence

Dr. William Tacke, a rehabilitation specialist, testified that initial ambulance reports and emergency room records from the White Sulphur Springs Hospital indicate that Palmer had suffered no fractures and that the bones of his face and skull were not damaged in the accident. He also testified that admission records from the Montana Deaconess Medical Center in Great Falls showed no thoracic or spinal injuries. Dr. Tacke testified that such results are consistent with a moderate rate of speed and describes Palmer's injury as a "closed-head injury," which is where brain damage occurs without a skull fracture. The defendant objected to this witness' testimony claiming that liability was the only question at issue before the jury and such medical evidence is not probative of which driver was at fault. It also argued that the testimony represented impermissible hearsay.

As the physician in charge of Palmer's rehabilitation, Dr. Tacke may testify concerning health records made by other health professionals if he has relied on them in forming opinions or inferences. Klaus v. Hillberry (1971), 157 Mont. 277, 285-86, 485 P.2d 54, 58-59; In the Matter of the Mental Health of G.S. (Mont. 1985), 698 P.2d 406, 409-10, 42 St.Rep. 451, 454-55; Garza v. Peppard (Mont. 1986), 722 P.2d 610, 613, 43 St.Rep. 1233, 1237; Rule 703, M.R.Evid. Dr. Tacke first saw Palmer as a consultant for neurologists who

were treating him and later worked with Palmer when he was deemed stable enough for rehabilitation. In these roles he used other physicians' records, charts, and reports to treat Palmer. When the physician uses other professionals' reports to advise a patient or to provide care, any hearsay objection to those reports fails. Ankenny v. Grunstead (1976), 170 Mont. 128, 133-34, 551 P.2d 1027, 1031. Thus, the defendant's hearsay objection to the physician's testimony was properly denied.

The physician's testimony also was relevant to the case. Besides noting that the injuries were consistent with moderate speed, the physician also testified that Palmer suffers from post-traumatic amnesia and remembers nothing about the accident. Both parties to this suit attempted to prove the other driver was travelling at excessive speed while they were driving at a reasonable pace. A lack of bodily injuries is useful to show the force of the impact, thereby creating an inference as to speed. See, Knuth v. Murphy (Minn. 1952), 54 N.W.2d 771, 775. In Goodnough v. State of Montana (1982), 199 Mont. 9, 647 P.2d 364, we held that the circumstantial evidence that moments before an accident the car's occupants were seen miles away relieving themselves was admissible to create an inference as to speed because its probative value outweighed its prejudicial nature. Goodnough, 647 P.2d at 368, citing Rule 403, M.R.Evid. In this case, Dr. Tacke's testimony was brief and concise. Because defense counsel had the right to cross-examine but chose not to do so, we find no prejudice.

At the conclusion of his rebuttal case, Palmer offered Plaintiff's Exhibit 6.1, the White Sulphur Springs Emergency Room report; 6.2, a dismissal form from the Montana Deaconess dated September 29, 1984; and 6.3 the White Sulphur Springs ambulance report. The defendant claimed these records lacked

foundation and were not the best evidence since no custodian came forth to verify the records. The District Court admitted the records as Rule 803(6) business records exceptions to the hearsay rule.

Ordinarily such documents would not be self-authenticating. See Rule 902, M.R.Evid. However, the defense had stipulated to the authenticity of a series of medical records including these three and had agreed there would be no need to call a medical librarian. Exhibits 6.1 and 6.3, prepared the same day as the accident by trained professionals, make no mention of alcohol being present or absent from Palmer's system. This serves to rebut a defense witness' claim that he smelled alcohol on Palmer as Palmer lay in the ditch after the accident.

The defense asserts on appeal that its concession that such records are authentic does not by itself make the medical reports admissible. The fact that it had agreed that neither side would need to call a records custodian and had opened the door on evidence concerning alcohol eliminates any harmful error in admitting this evidence. Under these particular circumstances we will affirm on this issue since the defense has been unable to identify any specific portion of the reports as inaccurate.

## Plaintiff's Use of Video Tapes

Defendant argues that the District Court erred when it allowed counsel for Palmer to use Plaintiff's Exhibit 11 as a demonstration and to enter Exhibit 23 into evidence. Exhibit 11 shows Evil Knievil driving southbound through the curve at various speeds on a 750-cc motorcycle. Exhibit 23 was a video tape made by the defense attorneys for their use in preparing their case. It shows the curve from different

angles and at one point the camera is mounted on the dashboard of a car as it drives through the curve.

We deal first with Exhibit 11.

This tape was shot from the shoulder on the east side of the highway directly adjacent to the northbound lane of traffic. The first several seconds of this video tape show a semi-tractor and trailer driving in a northerly direction in the wrong lane of traffic. It is apparent from the video tape that the right inside rear wheel of the trailer is tracking along the center line of the highway. This places the left side of the tractor and trailer well within the southbound lane. This tractor-trailer was not hired as part of a reconstruction or demonstration; it just happened to be driving through the area as the tape was made.

Serena Diacon testified that the tractor-trailer shown in this tape occupies "the exact position" on the road as the red tractor-trailer occupied on the day of the accident. She voiced this opinion after viewing this video tape two times almost three years after the accident. Serena admitted in voir dire by defense attorneys that she had seen no other tapes of trucks on that curve from which to choose which best represented the position of the red tractor-trailer. She also noted that she saw the red tractor-trailer on the day of the accident from the front and this video tape showed the truck from behind. However, she said she knew the tractor-trailer on the tape was in the same position by looking at the center line as it appears beneath the truck. The defense objected to this demonstration as prejudicial and lacking foundation.

Exhibits used for demonstration purposes are admissible if they supplement the witness' spoken description of the transpired event, clarify some issue in the case, and are more probative than prejudicial. Workman v. McIntyre

9

Construction Co. (Mont. 1980), 617 P.2d 1281, 1291, 37 St.Rep. 1637, 1650, citing 29 Am.Jur.2d, Evidence § 785. Movies are considered to be reliable if they are accurate and relevant with any change in circumstances explained. Brown v. North American Manufacturing Co. (1978), 176 Mont. 98, 117, 576 P.2d 711, 722. The admission of such evidence lies solely in the discretion of the District Court and we will not reverse unless a manifest abuse of discretion is shown. Brown, 576 P.2d at 722. A focal question in this case concerns where the red tractor-trailer was located on the highway prior to the accident. Since Serena testified that this video tape shows that location it is relevant. Questions concerning this video tape go not to its admissibility for demonstrative purposes, but rather to the weight to be given it.

As it admits or rejects various pieces of evidence, the District Court must bear in mind Rule 403, M.R.Evid.:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

To reduce the prejudicial effect of Exhibit 11, the District Court admonished the jury before Serena testified:

> THE COURT: Ladies and gentlemen, prior to the testimony of this witness, I want to read you a cautionary instruction.
>
> "During the next witness' testimony, you will see a video demonstration which the Court has ruled may be shown. This video tape was taken by the Plaintiff's attorney approximately two-and-a-half years after the accident.

10

"The video tape shows a semi truck and trailer over the center line on U.S. highway 89 approaching the Stud Horse intersection from the south. It is offered only to demonstrate visually the testimony of Serena Diacon. You are not to consider this video tape for any other purpose. It is not allowed for the purpose of showing that there is any general tendency for semi trucks to cross the center line on the curve in question. In viewing the video, you should consider the effect that the location of the camera operation had on the path taken by the semi. You should also consider the presence of a vehicle on the right side of the highway."

This admonition advises the jury that Exhibit 11 is only a visual illustration of a part of Serena's testimony and that it must be considered along with all other evidence and that it is not proof that trucks routinely cross the center line. In addition, the jury is told to consider what effect the position of the camera had on the path of the truck. This admonition is proper and serves to alleviate any prejudice in Exhibit 11. We find no abuse of discretion in admitting it for demonstrative purposes.

The video tape labeled Plaintiff's Exhibit 23 was made the day that surveyor Herbert Sherburne measured the curve for defendants but Sherburne testified that he had no role in producing the video tape and had never viewed it until the day he testified. Sherburne testified that his measurements show the vigilant driver approaching the curve from the north would have been able to see a 13-foot 4-inch high semi truck and trailer 750 feet away from the point Palmer's skid marks began.

Palmer introduced the exhibit through Sherburne in order to impeach his calculation. The defense objected to this use of Exhibit 23 because Sherburne had not made the

video tape, knew little about photography and was not aware of what type of lens was used to make the video tape, could not locate his survey stakes on the video tape and could not be expected to determine distances on a two-dimensional screen. The District Court cited the video tape's probative value, overruled the objection, and directed plaintiff to show the video tape at normal speed.

Sherburne need not be the maker of the video tape to introduce it. Pickett v. Kyger (1968), 151 Mont. 87, 97, 439 P.2d 57, 62. A video tape will be allowed as long as it shows a true representation of the scene at the time in question or any difference is explained. Lamb v. Page (1969), 153 Mont. 171, 176-77, 455 P.2d 337, 340; Pilgeram v. Hass (1946), 118 Mont. 431, 449, 167 P.2d 339, 348. Because the defendant's witness had testified a driver in Palmer's lane should have been able to see a truck 750 feet away, Palmer had the right to test the witness on that assertion and to impeach him if he could.

To do this Palmer played Exhibit 23, which at one point showed a tractor-trailer driving north and negotiating the curve. As this truck moved, Palmer's counsel on several occasions froze the frame on the tape so he could ask Sherburne how far away the truck was and whether it was in its proper lane of travel. On three occasions when counsel for Palmer asked Sherburne to indicate what distance on the screen represented 750 feet the defense objected and was sustained by the court. On another occasion when counsel for Palmer asked Sherburne if anything had been edited out of the tape, the defense objected and was sustained. By doing so the District Court exercised its discretion not only in permitting the video tape into evidence but also in policing the cross-examination. We find no manifest abuse of discretion that would warrant reversal.

12

In rejecting this issue of defendant's appeal, we rely on what appears to be the fair application of discretion by the District Court. The defendant makes a strong argument that these video tapes were not intended to demonstrate any witness' testimony or impeach any other witness so much as they were intended to constantly display to the jury a tractor-trailer either over the center line or right up against the center line. We will not pass judgment here upon that. The District Court's prompt and effective use of discretion in this case protected the relevancy of this evidence from damaging prejudice.

## Instruction No. 13

The defendant claims the District Court improperly gave a sudden emergency instruction. Instruction No. 13 read:

> The following traffic regulations of the State of Montana are designed to enhance safety on the public highways of this State:
>
> "1. A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety.
>
> 2. A person operating or driving a vehicle of any character on a public highway of this State shall drive it in a careful and prudent manner so as not to unduly or unreasonably endanger the life, limb, property, or other rights of a person entitled to the use of the street or highway.
>
> 3. A person operating or driving a vehicle of any character on a public highway of this State shall

drive it in a careful and prudent manner, and at a rate of speed no greater than is reasonable and proper under the conditions existing at the point of operation, taking into account the amount and character of traffic, condition of brakes, weight of vehicle, grade and width of highway, condition of surface and freedom of obstruction to view ahead, and he shall drive it so as not to unduly or unreasonably endanger the life, limb, property or other rights of a person entitled to the use of the street or highway."

If you find that the unidentified truck driver or David Palmer violated one of the statutes just read to you, you will find that such violation was negligence unless on behalf of such party its [sic] is proven by a preponderance of the evidence that he did what might reasonably be expected of a person or ordinary prudence [sic], acting under similar circumstances, who desired to comply with the law. In order to sustain such burden of proof, such party must prove by a preponderance of the evidence that he was faced with circumstances which prevented compliance or justified noncompliance with the statute.

The defendant's objection concerns the final paragraph of the instruction. This Court has ruled:

[A sudden emergency instruction] adds nothing to the law of negligence and serves only to leave an impression in the minds of the jurors that a driver is somehow excused from the ordinary standard of care because an emergency existed. This is not the law.

14

Simonson v. White (Mont. 1986), 713 P.2d 983, 989, 43 St.Rep. 133, 141-42. The use of a sudden emergency instruction was "banned" in automobile accident cases. White, 713 P.2d at 990.

The instruction read to the jury in the present case is more than a sudden emergency instruction. It presents three standards of care expected of all drivers of motor vehicles and says the failure to live up to the standards by any driver constitutes negligence. It requires the jury to decide not whether a sudden emergency erupted but whether either driver in this case was negligent forcing the other to take protective measures. Because it is more concrete than the instruction disapproved of in White, 713 P.2d at 989, and because it speaks to both drivers, we hold that this instruction is one in comparative negligence, not one in sudden emergency.

The defendant points out typographical errors exist in the final paragraph but there is no record that any objection was made while settling the instructions as to these typographical errors or that the jury was confused by the typographical errors. The misphrase "person or ordinary prudence" is harmless in the context of the instruction because it is clear that the instruction refers to the actions of a reasonable person, i.e. the "person of ordinary prudence." There is no appreciable difference and no harm has been done.

Prejudgment Interest

The District Court's amended judgment imposes prejudgment interest of 10 percent per year from July 13, 1984, which was 30 days after the claim had first been presented. Farmers asserts error since the policy's language strictly limits Farmers' liability only to the amount of

coverage and also because the court misused the statute on awarding prejudgment interest. We find this second contention persuasive.

Three conditions must be met before § 27-1-211, MCA, applies. First, there must be an underlying monetary obligation; second, the amount of recovery must be certain or capable of being made certain by calculation; and third, the right to recovery must vest on a particular day. Agri-Lease, Inc. v. Gray (1977), 173 Mont. 151, 160, 566 P.2d 1114, 1118-19; Safeco Insurance Co. v. Lovely Agency (Mont. 1985), 697 P.2d 1354, 1356, 42 St.Rep. 509, 511-12; Byrne v. Terry (Mont. 1987), 741 P.2d 1341, 1343, 44 St.Rep. 1620, 1622. When liability is contested, as it was here, the conditions fail since no monetary obligation exists until the day the jury determines the degrees of comparative negligence. The right to recover does not vest until the jury renders its verdict. McPherson v. Schlemmer (Mont. 1988), 749 P.2d 51, 54, 45 St.Rep. 33, 37. Palmer's right to recovery, therefore, did not vest until the jury returned its special verdict form on March 13, 1987 finding the unidentified driver of the red tractor-trailer negligent and Palmer not negligent. Palmer has no right to interest before the date of the verdict.

Finally, we note that the parties bifurcated the bad faith insurance claim from this matter of liability and the bad faith claim is still pending. In his recitation of facts on this appeal, Palmer has mentioned that Farmers denied his claims in 1984. At that time Farmers claimed its uninsured motorist policies did not take effect unless there was "physical contact" with a "phantom vehicle." Farmers believed such a provision to be lawful at the time. It was not until June 19, 1985, one year later, that this Court held in McGlynn v. Safeco Insurance Co. (Mont. 1985), 701 P.2d

16

735, 42 St.Rep. 882, that such a policy provision runs contrary to the public policy and therefore is unconstitutional. McGlynn, 701 P.2d 739-40. We do not believe that Farmers' adherence to a policy it considered to be lawful and which was later declared unconstitutional establishes any liability upon the insurer for the time period before the policy was struck down. We therefore would urge counsel for Palmer, if he elects to proceed on the bad faith insurance claim, to prosecute that case on allegations concerning the insurer's actions subsequent to the McGlynn decision.

Affirmed in part, reversed in part.

_____
Justice

We concur:

_____
Chief Justice


_____
_____
_____
Justices

17

Mr. Justice Fred J. Weber dissents as follows.

I dissent from the majority opinion because Instruction No. 13 was both unnecessary and confusing. Further, the use of a sudden emergency instruction such as the one in the last paragraph of Instruction No. 13 was disapproved in White.

Paragraph 2 of Instruction No. 13 is a statement of law that a driver shall drive "in a careful and prudent manner so as not to unduly or unreasonably endanger the life, limb, property, or other rights of a person entitled to the use of the street or highway." Paragraph 3 is a statement of law which requires persons to drive "in a careful and prudent manner" taking into account the conditions of traffic, the vehicle, the surface, and the view ahead. The last paragraph of the instruction then states that if one of the parties acted in a way which "might reasonably be expected of a person [of] ordinary prudence" but which was not in compliance with one of the above laws, there is no negligence. Read together these statements seem to excuse a person from acting in a careful and prudent manner. That is not an accurate statement of law.

As this Court has stated such an instruction "adds nothing to the law of negligence and serves only to leave an impression in the minds of the jurors that a driver is somehow excused from the ordinary standard of care because an emergency existed." White, 713 P.2d at 989. I would remand for retrial without the use of an instruction like Instruction No. 13.

_____
Justice

18

Mr. Justice L. C. Gulbrandson concurs in the foregoing dissent.

_____
Justice

Mr. Chief Justice J. A. Turnage concurs in the foregoing dissent.

_____
Chief Justice

19